Filed 6/2/16  P. v. Gutierrez CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B264624 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. VA132726) |
| v. | |
| RICHARD ANTHONY GUTIERREZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Olivia Rosales, Judge.  Affirmed.

Lenore De Vita, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Richard Anthony Gutierrez (defendant) appeals from the judgment entered after he was convicted of robbery and resisting arrest. He contends that he received constitutionally inadequate assistance of counsel because his attorney failed to object to eyewitness identification testimony or to request CALCRIM No. 315, a jury instruction listing factors for evaluating eyewitness testimony. We conclude that defendant has failed to demonstrate either counsel error or prejudice, and we affirm the judgment.

## BACKGROUND

Defendant was charged with two counts of second degree robbery, in violation of Penal Code section 211 (counts 1 and 2);[1] and with one count (count 3) of misdemeanor resisting, obstructing, and delaying of a peace officer or emergency medical technician, in violation of section 148, subdivision (a)(1). The information alleged as to counts 1 and 2 that defendant had suffered two prior serious or violent felony convictions within the meaning of the "Three Strikes" law, sections 1170.12 subdivisions (a)-(d), and 667, subdivisions (b)-(i), and within the meaning of section 667, subdivision (a)(1). The information further alleged as to counts 1 and 2 that defendant served three prior prison terms within the meaning of section 667.5, subdivision (b).

A jury found defendant guilty as charged. In a bifurcated trial, the jury also found true the enhancement allegations. On June 1, 2015, the trial court sentenced defendant to a total term of 36 years to life in prison and one day in county jail. The sentence as to count 1 was comprised of a third-strike term of 25 years to life in prison, plus two five-year enhancements for priors, with the one-year enhancements stayed. As to count 2, the trial court struck the prior convictions allegations and imposed a consecutive one-year term, which was one-third the middle term. The court awarded 562 days of actual custody credit and 84 days of conduct credit, and ordered defendant to pay victim restitution, as well as mandatory fines and fees. Defendant filed a timely notice of appeal from the judgment.

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

2

**Prosecution evidence**

On the afternoon of November 17, 2013, Mathew Oliva (Oliva) was in his car waiting at a red light at Penn Street near Pickering Avenue, when defendant crossed the street while staring at Oliva in a particular manner. Defendant then approached Oliva's open driver's window, leaned into the car, and demanded Oliva's money. When Oliva replied that he had no money, defendant said, "I'm not fucking playing," and "I'm dead serious. Give me your money." Defendant threatened to "bust a cap in your ass," or "pop a cap in your ass," and moved his hand around toward his back. Frightened, and thinking that defendant might have been reaching for a weapon, Oliva gave defendant his wallet, which contained his driver's license, California identification card, and bank cards. When the light turned green, Oliva drove away and telephoned the police.

Oliva testified that defendant was wearing a tank top, had tattoos on at least one arm that he recalled, and had a mustache. About two hours after the robbery, when the police brought Oliva to an alley where defendant was standing with other people, Oliva recognized him right away. In January 2014, Oliva selected defendant, who was in position No. 2 in a live lineup of six people, as the man who robbed him. Oliva identified defendant in court as the man who robbed him, observing that defendant was staring at him with the same look he gave while crossing the street. Oliva was one "hundred percent sure" of his identification.

On the same day that Oliva was robbed, two men assaulted Francisco Antonio Vasquez Carranza (Carranza) as he walked along Pickering Avenue. Carranza testified that one was a younger man, who appeared to be about 18 to 22 years old, and the other appeared to be in his mid 40's. The older man was wearing a black tank top and had tattoos on both sides of his neck, at the base of his neck, and on his arm. After the older man asked Carranza for money that Carranza said he did not have, the man threw Carranza to the ground. Both men punched Carranza and tore at his pockets and the older man took his wallet from his rear pocket. The wallet contained Carranza's social security card. Carranza chased the men as they ran on Pickering and Newlin Avenues, and although he was far behind, he never lost sight of the two men until they entered a

3

house on Newlin Avenue. Carranza called the police, who arrived within five minutes and then entered the house. Later, police officers found Carranza at his home and drove him to an alley, where he identified the two men in handcuffs as the robbers. Carranza testified that he told the police that he was 100 percent sure of his identification. Although defendant was one of the two men he identified, Carranza was later unable to identify defendant as one of the perpetrators, either at trial or at the preliminary hearing. At trial, Carranza testified that defendant was not one of the two men the police brought out of the house, and that defendant was not one of the robbers. Carranza was also shown the live lineup in January 2014, and identified the man in position No. 3 as the robber, rather than No. 2, defendant.

Carranza's neighbor, Elvis Carrillo (Carrillo), witnessed part of the assault from the other side of the street. Carrillo identified defendant in court as one of the assailants, and a photograph of Angel Hernandez (Hernandez) as depicting the other. Defendant was wearing a tank top and had a tattoo on his neck. Carrillo saw Carranza on the ground while the two men beat him with closed fists. When Carranza stood back up, they beat him back down to the ground, and then ran eastbound on Mar Vista Street. About 10 minutes later, the police took Carrillo to a nearby alley where he identified defendant and Hernandez, who were there with three or four police officers and some women. Carrillo was 100 percent certain of his identification, although he told the officers he was 80 to 90 percent certain because the suspects were wearing different clothes. Carrillo explained that the change of clothes caught him off guard at first, but he then recognized the robbers. Carrillo also viewed the live lineup conducted in January 2014, and identified defendant in position No. 2. At trial, Carrillo was still 100 percent certain of his identification.

Whittier Police Officer Carl Martin testified that he was dispatched to the area of the two robberies a few minutes after 1:00 p.m., where he was flagged down by witnesses Ricardo Barrera (Barrera) and Carrillo. At 1:45 p.m., he received an anonymous tip to go to a certain address on Newlin Avenue, Apartment G. There he found defendant. Officer Martin later transported Carrillo to the area for a possible identification. Carrillo said he

4

was not 100 percent sure, because defendant's clothing threw him off. Officer Martin did not consider this to be a positive identification. Carrillo told him that the men looked familiar but were wearing different clothes, and he did not want to commit to a yes or no answer. Barrera was not available for a show up at the time.

Whittier Police Officer Jim Azpilicueta was also dispatched to the area of the robberies. He spoke to Carranza, who gave a description of the robbers. One was a male Hispanic between 28 and 40 years old, about 5'8," thin build, wearing a black tank top, white shorts, tattoos on his arms, and the other was much younger. Officer Azpilicueta was then called to the apartment building on Newlin Avenue where Officer Martin and other officers were waiting. An anonymous caller had described a suspect there as wearing a gray tank top and white shorts, and as having a mustache. When he arrived, Officer Azpilicueta saw defendant inside, sitting directly in front of the window. He was wearing white shorts but no shirt. The officer saw tattoos on defendant's arms which matched the victims' descriptions. Hernandez was also inside. Once outside the man were patted down for weapons, handcuffed, and detained for a field show up.

Officer Azpilicueta brought Carranza to the field show up. Before transporting him, the officer read the standard field show up admonition to him in Spanish.[2] As the officer pulled into the alley, about 30 feet away from defendant and Hernandez, Carranza immediately said, "Those are them." When asked to identify the person who took his wallet, Carranza identified defendant, and said both men had punched him. Officer Azpilicueta took Carranza home and then brought Oliva to the alley after reading him the field show up admonition. As soon as Oliva saw the two men, he said, "That's him," referring to defendant. Oliva said he was 100 percent positive. Officer Azpilicueta

---

[2] Officer Azpilicueta read it in English for the jury, as follows: "In a few moments I am going to show you a person or persons who may or may not be responsible for the crime. The fact that this person or these persons are in custody or handcuffed should not influence your judgment. You are not obligated to make an identification. It is just as important that the innocent person is freed from suspicion as to identify the guilty. Please do not make any statements in front of the witnesses or suspects."

explained that during the field show up officers remained next to the suspects to prevent them from escaping or running. There were no males present other than the suspects and the officers. The women occupants of the apartment waited a short distance away.

Defendant was arrested and placed into Officer Azpilicueta's patrol car.[3] While searching defendant's apartment Officer Azpilicueta found a black tank top on the floor next to the chair in which he had seen defendant sitting. After being alerted by Sergeant Hansen, Officer Azpilicueta looked into a nearby trash can and saw a cardboard toilet paper tube with Oliva's credit cards and identification inside.

Officer Azpilicueta identified five photographs depicting defendant's tattoos, one on the right arm, one on the right side of defendant's neck, another on the left side of defendant's neck, and one on the left forearm. Looking at defendant in court, Officer Azpilicueta could see tattoos on right side of defendant's neck, but that tattoo was not apparent in his booking photograph. Similarly, Sergeant James De Masi, who helped Officer Martin bring defendant into the station, testified that while the tattoo on the left side of defendant's neck was apparent in his booking photograph, the photograph did not clearly show the tattoo on the right side. Observing defendant at trial, however, Sergeant De Masi could see both tattoos.

**Defense evidence**

Barrera testified that he saw two Hispanic men grab Carranza, his neighbor, and throw him to the ground at about 9:00 a.m.[4] Barrera took his son into his house and then went outside to check on Carranza as the police were arriving. Barrera described the

---

**3** When defendant was arrested, he was agitated, belligerent, upset, verbally abusive, and physically resistant to many of the officers' orders. Officer Martin, who transported defendant to the station, called for the assistance of two other officers, and applied a "semi-pain control hold" or "wrist lock" upon defendant's wrist to gain his compliance until they were past the main entry, when defendant again resisted. Defendant stiffened, turned quickly toward Officer Martin, and bumped him, causing the officer to be pushed against the wall. The officers then took defendant down to the ground and carried him to a security cell.

**4** All other witnesses testified that the attack took place around 1:00 p.m.

taller of the two assailants as younger, and the shorter one as older, in his 40's. Barrera could not give more detailed descriptions, as he saw them for only two or three seconds. In January 2014, he viewed the live lineup but was unable to make an identification; and at trial, he was unable to identify anyone in the courtroom as having been in the lineup.

The defense also called Deputy Sheriff Nicholas Neri, who conducted the live lineup in January 2014. He testified that there were always six people in a lineup, five of whom were "fillers" unrelated to the case. In this case, he went to the jail dormitories and found five people, each with a similar weight, height, facial hair, hairstyle, and ethnicity to defendant's. He tried to choose fillers who would prevent the suspect from standing out, and they were all dressed alike. Defendant was placed in the No. 2 position. Carranza identified the man in the No. 3 position. Oliva chose No. 2, whom Officer Neri identified in court as defendant. Carrillo also chose No. 2. A defense attorney was present and given the opportunity to object to the filler selections, but no objection was made.

Defendant testified that he had nothing to do with the robbery.[5] He claimed that all the witnesses who identified him were mistaken, and that he had not worn a tank top that day, but rather, a white long-sleeve T-shirt. Defendant admitted that the five photographs shown at trial depicted his current tattoos, but denied that he had tattoos on both sides of his neck on the day of his arrest. He claimed that although he had one of the neck tattoos since 1994, he got the other neck tattoo in January or March 2014 while in jail after his arrest. He admitted that tattooing in jail was prohibited.

Defendant claimed that on the day of the robberies, he was home cleaning his carport until about 10:00 a.m., he then went for a walk and jog about four blocks away with his now ex-girlfriend or wife Crystal Trabezo (Trabezo), Hernandez's mother. Hernandez and his girlfriend Michelle remained in the apartment when they left. Defendant and Trabezo stopped at a 7-Eleven store afterward, and arrived home between

---

[5] The question from his attorney was, "And is it your testimony that you had nothing to do with the robbery that's been described in this trial so far?"

11:30 a.m. and noon. Although defendant thought video from cameras at 7-Eleven would have shown that he was there, he never told police he had been there that day. Defendant also thought that Trabezo would be able to corroborate his whereabouts but she did not testify. Hernandez was not home when defendant and Trabezo returned from their walk, but Michelle and the baby were there. After defendant watched television for awhile, Trabezo asked him to find her son because she was upset with him. Just as defendant left the apartment to look for him, Hernandez came running home, so defendant resumed watching television until the police arrived and tapped on the window. When defendant opened the door, the officers pulled him outside, told everyone else to step outside, placed defendant and Hernandez in handcuffs, and brought people to identify them. Defendant and Hernandez were handcuffed and surrounded by three or four officers during the identifications. Defendant denied that he had been shirtless when police arrived, and claimed that he still wore the white shirt he had worn on his walk earlier.[6]

Hernandez testified that he loved defendant who had been his stepfather since Hernandez was about 13 years old. At the time of his testimony, 18-year-old Hernandez was in juvenile custody due to a burglary adjudication. Defendant was about 45 years old. In November 2013, Hernandez was almost 17 years old and lived with defendant and his mother. Hernandez admitted robbing Carranza. He completed a six-month placement in youth camp imposed as a result of the robbery. Hernandez claimed that defendant was not involved in the robbery and did not take Carranza's wallet; rather,

---

[6] Defendant admitted being on parole at the time of the robberies, having been convicted in 1997 of assault with a deadly weapon and personally inflicting great bodily injury. Defendant also admitted his convictions of felony assault in 1994 and 1995. Defendant denied resisting the police officers, explaining that his back spasms sometimes affected the use of his leg. His anger toward Officer Martin was due to the officer's repeated attempts to speak to him despite not having read him his *Miranda* rights; so he told him to "shut the fuck up." Defendant claimed that Officer Martin grabbed his wrist for walking too slowly, and then pushed him against the wall, causing him to lose balance. His attempt to regain his balance caused Officer Martin to fall backward, and then the officers "stomped" him with their boots, threw him into the sobriety tank, and kicked him in the back and head. He did not require medical attention and there was no report made of the stomping or kicking.

Hernandez committed the crime with two men he had met in the park that morning, who were in their 30's. Hernandez did not know the men's names, who they were, or how to contact them. When Hernandez left the apartment, between 10:00 and 11:00 a.m., defendant had already left with Trabezo and the dog. Defendant was home when Hernandez ran home after the 1:00 p.m. robbery. Hernandez claimed that he had not seen defendant between those times, had not been with him, and did not know what he was doing. He also said his unnamed fellow robbers ran away after the robbery.

Hernandez testified that defendant had all his tattoos for years prior to November 2013, including the tattoos on his arms, shoulders, and back, as well as those on both sides of his neck. Defendant also had a thick mustache in November 2013. Like defendant, one of Hernandez's accomplices had tattoos on his arms, wore his hair similar to defendant's hairstyle, and had a mustache. Hernandez could not remember what his accomplices were wearing or where else they had tattoos. However, defendant "always" wore tank tops, and Hernandez thought he was wearing a black one on the day of the robbery.

Robert Shomer, who has a doctorate in experimental psychology and human behavior, testified as the defense expert in eyewitness identification. Dr. Shomer had not interviewed any of the witnesses in this case and did not render an opinion on the accuracy of their identifications. He did not claim it was not possible for an eyewitness to make an accurate identification, but testified that memories could change, and that memory was easily influenced by suggestion. Research indicated that identifications were more reliable when they were "fair," meaning they were not conducted in a way to suggest that the police were showing the witness someone connected with the crime. He explained the three primary ways that the police obtain an identification: a live lineup; photographic lineup; and a field show up. Studies had revealed a much higher rate of error in field show ups than with photographic or live lineups. A live lineup would produce the most accurate identification, but only when it was the witness's first attempt at identification, so that his memory would not be influenced by a familiar face. In Dr. Shomer's opinion, field show ups were inherently suggestive, as the witness who is

9

still emotionally aroused is typically shown a suspect in police custody, often handcuffed, with several officers surrounding him for officer safety. Stress in a normal person would reduce his ability to resist suggestion, and more so in a person with a challenged mental capacity.[7] Dr. Shomer agreed that an immediate identification had the advantage of less memory decay, but that advantage was outweighed by the inherent suggestibility of the field show up. Dr. Shomer did not think that the confidence of the witness in his identification was a good gauge of accuracy, especially if the witness appeared to become more confident after repeated identifications.

## DISCUSSION

### I. Field show up

Defendant contends that the field show up procedures were impermissibly suggestive and tainted all subsequent identifications by witnesses who first identified defendant in a field show up. He also contends that he was deprived of his constitutional right to effective assistance of counsel due to his attorney's failure to seek suppression of all in-court and out-of-court identifications by such witnesses.

The Sixth Amendment right to assistance of counsel includes the right to the effective assistance of counsel. (*Strickland v. Washington* (1984) 466 U.S. 668, 686-694; see also Cal. Const., art. I, § 15.) To prevail on a claim of ineffective assistance of counsel, defendant must establish two components: (1) that counsel's representation fell below an objective standard of reasonableness; and (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington*, *supra*, at p. 694.) "If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1126.)

---

**7** Officer Azpilicueta observed that Carranza appeared to have some type of mental disability, and Carranza's trial testimony was sometimes disjointed, wandering into topics that were not the subject of examination. Carranza testified that he was under the care of a psychiatrist or psychologist and took medication, and that he had been hospitalized once for a brain injury, but he denied that it affected him.

10

There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 689.) Thus, "[r]eviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation]." (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437.) "[C]ounsel's decision whether or not to object to inadmissible evidence is a matter of trial tactics. [Citation.] Because we accord great deference to trial counsel's tactical decisions, counsel's failure to object rarely provides a basis for finding incompetence of counsel. [Citations.]" (*People v. Lewis* (2001) 25 Cal.4th 610, 661.) Moreover, the defendant "must establish deficient performance based upon the four corners of the record. 'If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003 (*Cunningham*).)

Defense counsel's reason for not bringing a motion to exclude the identifications was not expressed on the record. Relying on *People v. Nation* (1980) 26 Cal.3d 169 (*Nation*), defendant contends that because such a motion would not be made in the presence of the jury, there can be no satisfactory tactical reason for failing to make such a motion. Defendant has overly abbreviated the holding in *Nation*. In fact, the court stated: "Since an objection to the identification evidence would have been adjudicated outside the presence of the jury, there could be no satisfactory tactical reason for not making a *potentially meritorious* objection. [Citation.]" (*Id*. at p. 179, italics added.) The Sixth Amendment does not require counsel to raise unmeritorious motions. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 804-805.)

Defendant has failed to demonstrate that an objection to the identification evidence in this case was potentially meritorious. The admission of identification evidence does not violate a defendant's right to due process unless the identification procedure was *unduly* suggestive *and* unnecessary. (See *Cunningham*, *supra*, 25 Cal.4th at p. 990.) Defendant makes the circular argument that the field show ups were unduly

11

suggestive because showing a suspect in police custody is suggestive.  "To begin with, '[t]he "single person show up" is not inherently unfair.'  [Citation.]" (*People v. Ochoa* (1998) 19 Cal.4th 353, 413, fn. omitted; see *Stovall v. Denno* (1967) 388 U.S. 293, 302.) The suggestiveness of a single suspect in handcuffs, surrounded by police officers is often offset by "the interest of fairness to criminally accused persons and prompt, proper and efficient law enforcement."  (*In re Richard W.* (1979) 91 Cal.App.3d 960, 969-970; see also *Stovall v. Denno*, *supra*, at p. 302.)

Defendant argues that the field show ups were unnecessary, as the suspects and witnesses were unlikely to become unavailable through death or unconsciousness, and there was nothing to prevent the police from transporting him to the station for a less suggestive identification procedure.  As the robbers showed themselves to be dangerous, and were followed to a house in the neighborhood, we do not agree that any risk to the witnesses was unlikely.  Further, we do not agree that nothing prevented transporting defendant to the station and holding him long enough to put together a photographic or live lineup.  Prior to the field show up identifications, defendant was only detained, not arrested.  Officer Martin testified that if no one had identified defendant, there would have been no cause to arrest him.  Furthermore, defendant's resistance to arrest suggests that he was unlikely to volunteer for a lengthy detention at the police station in order to facilitate identification.  Thus, prompt identification was necessary to justify either arresting or releasing the suspects.  Moreover, the prompt identification and arrest preserved important evidence by allowing the officers to search inside and around the apartment, leading to the discovery of the tank top near defendant's chair and the toilet paper tube in which Oliva's credit cards and identification had been concealed.  In addition, the field show ups were not unduly suggestive, given the admonition read to each witness prior to their arrival at the field show up location.

Regardless, if the field show up had been unduly suggestive, the court would then consider "whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of

12

the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification. [Citations.]" (*Cunningham*, *supra*, 25 Cal.4th at pp. 989-990; see also *Manson v. Brathwaite* (1977) 432 U.S. 98, 104-107; *Neil v. Biggers* (1972) 409 U.S. 188, 199-200.) Here, the robberies occurred during daylight and both Oliva and Carranza saw the perpetrator from a distance of a few inches. The perpetrator further focused attention on himself by speaking to the victims. The attention of Oliva and Carranza was sufficiently focused to allow them to observe that the robber wore a tank top and had tattoos, for Oliva to observe that the robber had a mustache, and for Carranza to see tattoos on both sides of defendant's neck and discern the age difference of more than 20 years between the two robbers. While Carrillo saw the Carranza robbery from across the street, he was also able to see that the suspect wore a tank top. The similarities in the descriptions given demonstrated their accuracy, and all three witnesses were certain of their identifications. Finally, the three field show ups occurred within one to two hours after the incident.

To demonstrate unfairness, defendant has selected minor conflicts and isolated circumstances, which he has exaggerated or understated. For example, defendant argues: that Oliva's identification was suspect, as he looked the robber in the face only while the robber was speaking; that close combat probably prevented Carranza from seeing the robber's face; that Carranza's observation of the robber's two neck tattoos must have been mistaken;[8] that Carrillo may have been too far away to see the defendant's face; that there were conflicting reports of the color of the tank top; and that Carrillo was unable to make an identification at the show up.[9]

---

[8]    Referring to his own testimony that one of his neck tattoos was newly acquired, defendant claims that the observation was in fact mistaken; however, Hernandez testified that defendant had tattoos on both sides of his neck for years.

[9]    Defendant understates Carrillo's degree of certainty. In fact, Carrillo stated that he was 100 percent certain, but told the officer that he was only 80 to 90 percent certain due

13

We conclude that the totality of the circumstances in this case demonstrates that the identifications were reliable, and we are not persuaded otherwise by defendant's argument and conjectures. We further conclude that the trial court would have denied any motion to exclude evidence of the field show ups, the live lineups, or the in-court identifications; thus defendant has not met his burden to show error by his counsel or that counsel had no satisfactory reason for not bringing a motion to exclude the identifications.

In any event, we agree with respondent that defendant has failed to demonstrate prejudice, as other evidence supported defendant's identity as the robber of both victims. Carranza followed defendant and Hernandez to their apartment building without losing sight of them, and then an anonymous call was made to the police, with the address and description of the robbers. Officer Azpilicueta testified to collecting statements from Carranza at his home and with Oliva at the crime scene, before going to defendant's apartment building based on the anonymous call. The officer thus had a description of defendant when he saw him through the window, and before taking the witnesses to the alley for a field show up. Inside the apartment was the younger Hernandez, who admitted having committed the Carranza robbery with a man who shared many identifying characteristics with defendant, including tattoos and a mustache. Although Hernandez denied that defendant was his accomplice, the jury was not required to believe him. The police found defendant's tank top next to the chair in which he had been sitting and Oliva's stolen property in the trash outside defendant's apartment. All three witnesses testified that the robber wore a tank top and had tattoos; Oliva testified that the robber wore a mustache; and Carranza testified regarding the age difference between the two robbers and the tattoos on both sides of defendant's neck.

Such facts provide strong support for the witnesses' identifications and preclude any reasonable probability that the result of the proceeding would have been different even if defense counsel had brought a successful motion to suppress that evidence.

to the change of clothes; and Officer Martin did not consider this to be a positive identification.

Defendant has thus failed to demonstrate error by counsel or prejudice, and his claim of ineffective assistance of counsel must be rejected. (See *Strickland v. Washington, supra*, 466 U.S. at p. 694.)

## II. CALCRIM No. 315

Defendant contends that his trial counsel provided ineffective assistance by failing to request that the jury be instructed with CALCRIM No. 315. Initially we observe that the record does not support defendant's assumption that the instruction was not given because defense counsel failed to request it. In fact, the record reflects that when the trial court identified the instructions requested by the defense and prosecution, CALCRIM No. 315 was among them, although the court did not specify which party had made the request. At that time, the court invited the attorneys to lodge any objections or requests for changes, but none was made as to CALCRIM No. 315. We have found no further mention of CALCRIM No. 315 in the record. It does not appear in the packet of instructions given or in the reporter's transcript of the instructions read to the jury, and there is no explanation for its omission. Thus it is not apparent from this record that defense counsel failed to request CALCRIM No. 315, as defendant contends.

On this record, defendant cannot meet his burden to show that defense counsel's performance with regard to CALCRIM No. 315 fell below an objective standard of reasonableness. Indeed, defendant cannot show what counsel did at all, if anything. Thus, we must presume that whatever counsel did or did not do, it was the result of a reasonable tactical decision. (See *Strickland v. Washington*, *supra*, 466 U.S. at pp. 689, 694.) Moreover, as the record is silent as to counsel's reason for acting or omitting to act, defendant cannot overcome this presumption where, unless the record on appeal affirmatively discloses that counsel had no rational tactical purpose for doing whatever he did or did not do. (*People v. Lucas*, *supra*, 12 Cal.4th at pp. 436-437.)

Defendant argues that counsel's lack of an informed tactical reason not to request the instruction can be demonstrated by applying the factors enumerated in CALCRIM No. 315 for evaluating eyewitness testimony to the evidence in this case. As respondent observes, however, such an analysis reveals a sound tactical reason for the defense to

15

have objected to the instruction.  Referring to the substantially similar factors in CALJIC No. 2.92, one court stated:  "The instruction cuts two ways.  While it may be of benefit to a defendant in a particular case, so may it enhance the prosecution's argument in another.  Each case relying on identification by a single witness is as unique as are individual human beings.  Different witnesses will exhibit differing degrees of certainty, confidence, credibility, and ability to communicate.  Each incident will present its own unique situation in terms of opportunity to observe.  Stress may cause one witness to indelibly imprint the identification in his or her mind and another to repress the incident.  We can readily see why a particular defendant may not want the trial judge to call to the jury's attention the very factors a prosecutor thinks are the strong points of the state's case."  (*People v. Sanchez* (1990) 221 Cal.App.3d 74, 77.)

The *Sanchez* court's remarks are equally applicable here.  CALCRIM No. 315 would have told the jury to evaluate eyewitness identification by considering the following questions:  "Did the witness know or have contact with the defendant before the event? [¶] How well could the witness see the perpetrator? [¶] What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, [and] duration of observation[ . . . ]? [¶] How closely was the witness paying attention? [¶] Was the witness under stress when he or she made the observation? [¶] Did the witness give a description and how does that description compare to the defendant? [¶] How much time passed between the event and the time when the witness identified the defendant? [¶] Was the witness asked to pick the perpetrator out of a group? [¶] Did the witness ever fail to identify the defendant? [¶] Did the witness ever change his or her mind about the identification? [¶] How certain was the witness when he or she made an identification? [¶] How certain was the witness when he or she made an identification? [¶] Are the witness and the defendant of different races? [¶] [Was the witness able to identify other participants in the crime?] [¶] Was the witness able to identify the defendant in a photographic or physical lineup?]  [¶] . . . [¶]  Were there any other circumstances affecting the witness's ability to make an accurate identification?"  (CALCRIM No. 315.)

16

When applied to the evidence in this case, only a few of the factors would favor a finding of misidentification, for example: the witnesses' lack of prior contact with defendant; the victims' stress; single-person or nearly single-person show ups; Carrillo's distance from the Carranza robbery; and Carranza's later inability to make an identification. On the other hand, as demonstrated by our discussion rejecting defendant's claim that the show ups were unfairly suggestive and unreliable, application of a majority of the factors enumerated in CALCRIM No. 315 to the evidence would have favored a finding that the identifications were accurate. For example, the witnesses observed defendant in daylight; the weather was apparently fine, as defendant wore a tank top; the two victims observed defendant from very close range; the time interval between the event and the field show ups was fairly short; the witnesses' descriptions were similar and essentially matched defendant's physical appearance; two of the witnesses were later able to identify defendant from a live lineup and in court; the witnesses were certain of their identifications, and two of them remained certain throughout.

In sum, the record does not reveal why CALCRIM No. 315 was not given despite an apparent request by one of the parties, but it does suggest a rational tactical reason for defense counsel to refrain from requesting it or for objecting to it.

Moreover, if there was some failure on the part of defense counsel, defendant has not demonstrated that he suffered prejudice as a result. The absence of an instruction on eyewitness identification factors is harmless where the evidence of defendant's identity was strong and the appropriate factors were brought to the jury's attention by cross-examination, counsel's arguments, and other jury instructions, and the jurors gave no indication that they were uncertain or confused. (*People v. Wright* (1988) 45 Cal.3d 1126, 1144-1145 [CALJIC No. 2.92].) We have previously concluded that the identity evidence was strong. Dr. Shomer gave lengthy expert testimony regarding the effect of suggestion, changing memories, and stress on identification, as well as the value of confidence, perceived certainty, and immediacy of the identification. In closing argument, defense counsel pointed out conflicts in the witnesses' testimony which

suggested inattention, and faulty perception and memory, such as Oliva's failure to notice any tattoos on the robber's hand, which were inside the car and very close, or the failure of the witnesses to agree on the robber's neck tattoos.  The trial court read CALCRIM No. 226, which informed the jury how to evaluate witness testimony, including such factors as how well could the witness see, hear, or otherwise perceive, and remember the subject of his testimony.  Finally, the only confusion expressed by the jury concerned the time of the assault on Carranza.

We conclude that defendant has failed to demonstrate counsel error, and that there is no reasonable probability that the result would have been different had the court read CALCRIM No. 315.  Defendant has thus failed to establish either of the two components of a claim of ineffective assistance of counsel.  (See *Strickland v. Washington*, *supra*, 466 U.S. at p. 694; *People v. Rodrigues*, *supra*, 8 Cal.4th at p. 1126.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
CHAVEZ

We concur:


_____, Acting P. J.
ASHMANN-GERST


_____, J.
HOFFSTADT


18